Filed 9/30/15  P. v. Milosavljevic CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STANIMIR MILOSAVLJEVIC,<br><br>    Defendant and Appellant. | B254067<br><br>(Los Angeles County<br>Super. Ct. No. MA060832) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John Murphy, Judge.  Affirmed.

Jasmine Chandulal Patel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Chung Mar and Jessica C. Owen, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Stanimir Milosavljevic raises contentions of instructional error following his conviction of corporal injury to a spouse and attempting to make criminal threats.

For the reasons discussed below, the judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rules of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

   a. *Testimony of Danica Tomic.*

Danica Tomic testified she and defendant Milosavljevic are Serbian. They have been together for 15 years, and have been married for eight of those years. On September 16, 2013, Tomic was working in the front yard when Milosavljevic accused her of having met with their neighbor's boyfriend. Milosavljevic was holding a crowbar, but he did not raise it or strike her with it. Tomic said she did not want to fight and went into the house to retrieve her wallet and keys. She was in the bedroom looking for her cell phone when Milosavljevic came in. He blocked the bedroom door and said she could not leave. Because he was holding the door handle to prevent her from leaving, Tomic got upset, scratched him and spit at him. She might also have bit him, but she could not recall. She testified that during this entire encounter Milosavljevic did not touch her.

Without having found her cell phone, Tomic left the house and got into her car, intending to leave. Milosavljevic said he was not going to let her leave. He stood in front of her car for five or ten minutes while talking to their neighbors. Finally, Tomic was able to leave. She drove around for a while and then went to a police station, where she informed a female deputy sheriff sitting at the front desk what had happened. By this time, Tomic's lip was bleeding because a fever blister had broken. Because her lips were very dry and cracked, the fever blister broke "[e]ither from me trying to scream at [Milosavljevic] and yelling at him or [when I] tried to bite him."

Tomic denied having told the female deputy that Milosavljevic hit her during the incident. Tomic testified she also spoke to a male deputy sheriff as well as two people

from the fire department who treated her lip and took photographs. She denied having told either deputy that she did not want to press charges because she was afraid Milosavljevic would kill her. She also denied telling them that, in an earlier incident, Milosavljevic left a bruise on her neck when he tried to strangle her.

Tomic testified she had called the police a year earlier, on September 9, 2012, about an incident during which she and Milosavljevic were violent with each other. Milosavljevic's gums started bleeding while they were having an argument. He handed her a cell phone but, when she would not take it, he dropped it on her. Tomic denied that Milosavljevic hit her with the phone. Asked how Milosavljevic's mouth had been injured, Tomic testified: "[H]e said that I hit him. And I remember that I just maybe used my fist. Maybe I just pushed him away."

On cross-examination, defense counsel showed Tomic a photograph of Milosavljevic's scratched chest taken after the 2013 incident. Tomic testified she scratched him while trying to get him away from the bedroom door: "I grabbed his stomach with both hands." The following colloquy also occurred:

"Q. [O]ver the course of the 15 years [you've been together], has your husband ever said, I'm going to kill you because he was mad?

"A. We say that to each other a lot.

"Q. And when he says it to you, are you ever afraid that he's really going to kill you?

"A. No.

"Q. And you also say it to him, but you don't mean it either, right?

"A. Yes."

Tomic denied ever telling their next-door neighbor Julie Tice that Milosavljevic had hit her and she wanted to leave him but that she was too frightened. Tomic testified she loves Milosavljevic, wanted all the charges against him dropped, and wanted him to come back home.

3

b. *Testimony of David Hansen*

David Hansen is the adult son of Julie Tice. Hansen was at his mother's house on September 16, 2013, when he saw Tomic and Milosavljevic arguing in their yard. Milosavljevic was cursing Tomic, calling her "a fucking tramp, whore," and saying, "I will kill you, you little bitch." Hansen saw Milosavljevic go into the garage and take something from a bucket. Hansen testified Milosavljevic "had it up like this (indicating [arm extended above his head]). He said, 'I will kill you, bitch.' " Hansen thought the object might have been a hammer.

Asked if Milosavljevic had been speaking English when he was yelling at Tomic, Hansen testified: "Yes. Some words, he was speaking in his own language." The following colloquy occurred:

"Q. . . . When [Milosavljevic] said, 'I'm going to kill you,' and you [testified about] all those bad words that he said, did he say that in English or Serbian?

"A. Sir, I don't exactly know.

"Q. Okay. [¶] How did you know what he was saying?

"A. Because the way he was talking to her, you know."

After Tomic went inside the house and then came back outside and got into her car, Milosavljevic yelled for Tice, who came outside and spoke to him for a long time while he stood in front of Tomic's car, pounding on the hood. Hansen heard Milosavljevic tell Tomic, "I'm going to kill you, you bitch" in English, and he heard Tomic say to Tice, "Julie, I'm scared. I need to get out of here." Milosavljevic said to Tice, "Julie, don't believe her. She's lying to you."

Hansen testified that Tomic seemed "scared for her life" because of "the way [Milosavljevic] was acting and . . . how outraged he was." However, Hansen never saw Milosavljevic hit Tomic, and Tomic never asked Hansen to call the police.

4

c. *Testimony of Julie Tice.*

Tice testified she had been living next door to Milosavljevic and Tomic for 15 years. On September 16, 2013, she heard Milosavljevic scream Tice's name and she came outside. Milosavljevic had his hands on the hood of Tomic's car and he was saying that "he was going to kill her. And he called her a whore and a slut and bitch." Tice testified Milosavljevic was very angry and loud: "He scared me. I have never seen him that angry before." The passenger side window of Tomic's car was open and Tice was able to talk to her. Tomic looked "horrified." "Her eyes were as big as quarters. Her face was white. And she was scared. [¶] I said, 'I'll try and get him away from the front of the car.' But he was so angry and screaming so loud, I didn't know if I could or not." Tice testified she had seen Tomic "scared, but not that scared."

Milosavljevic told Tomic, " 'When I'm through killing you, I'll find that son-of-a-bitch, and I'll kill him, too.' " Tice knew Milosavljevic was referring to Tice's friend Harry Lagardia. Milosavljevic said he had proof Tomic was having an affair with Lagardia, and that he was going to kill Lagardia after he killed Tomic.

Tice testified that, during the last three years, she often witnessed Milosavljevic screaming at Tomic late at night because Tice's kitchen is directly across from their kitchen. She described once having heard a thump and seeing Milosavljevic punching toward the floor. The following day she saw Tomic with "black and blue marks all over her." Asked if she called the police after witnessing this incident, Tice replied, "No, Because [Tomic] told me not to ever call the police because if I did, he would kill her. [¶] Q. When did she say that? [¶] A. Ever since I have known her."

d. *Testimony of Megan Behounek.*

Megan Behounek, a Los Angeles County Deputy Sheriff who responded to the 2012 domestic violence incident, had videotaped Tomic giving a short statement. The videotape, which was played for the jury, contained the following dialogue:

"Deputy Behounek: What happened?

"Danica Tomic: He grabbed my jaw and he was threatening that he was going to kill my daughter and he was going to kill me and he was going to change the system. . . .

5

"Deputy Behounek: Ok so what happened to your chest?

"Danica Tomic: He threw the phone. [¶] . . . [¶] I am laying down and then he comes in starts yelling and screaming saying that do you understand that I am going to kill you and your daughter and change the system.

"Deputy Behounek: Did he say how he was going to kill you?

"Danica Tomic: No.

"Deputy Behounek: Do you believe that he is going to kill you?

"Danica Tomic: I never know.

"Deputy Behounek: You never know.

"Danica Tomic: I never know."

Behounek photographed a "pretty significant" bruise on Tomic's chest where she had been hit by the phone. Behounek also photographed a bruise on Tomic's breast caused when Milosavljevic threw the phone at her a week earlier. Because Milosavljevic's gums were bleeding, Behounek took him to the hospital where a doctor said Milosavljevic had a laceration on the tip of his tongue.

### e. *Testimony of Amber Little.*

Los Angeles County Deputy Sheriff Amber Little was the watch officer when Tomic drove to the police station after the 2013 incident. Little testified Tomic came in "crying and said that her husband had beat her up. And I saw the blood on her lip. So that's when we went and called the paramedics for her." Tomic told Little that her husband had hit her in the face, and that he "was holding a hammer and had threatened to kill her."

### f. *Testimony of Richard Sanchez.*

Los Angeles County Deputy Sheriff Richard Sanchez testified that on September 16, 2013, he responded to Milosavljevic's house in response to a neighbor's call about a woman screaming. Sanchez spoke to Milosavljevic, who smelled of alcohol and seemed to be "under the influence." He then met with Tomic at the police station. Tomic "seemed scared." "She was crying." She told him "that while she was outside,

6

[Milosavljevic] came out holding a hammer above his head and told her he was going to fucking kill her. She said he stated, 'I'm going to fucking kill you, you slut.' "

Tomic told Sanchez that she went into the bedroom to get her things. Milosavljevic followed her, closed the door behind them and stood in the doorway. When she unlocked the door to leave, Milosavljevic grabbed her wrist. Tomic began scratching Milosavljevic to get him to let go. She did not exactly know how her lip started bleeding but it happened "while they were . . . locked in the bedroom." Tomic did not tell Sanchez her lip was bleeding because of a fever blister or because she had bitten Milosavljevic.

Tomic told Sanchez that a discoloration on her neck had been caused by Milosavljevic during a prior incident of domestic violence a few weeks earlier. Sanchez testified: "[K]nowing that she had a previous domestic violence case and it didn't get filed because she was unwilling to testify, I asked her if she was going to do the same thing. She . . . shook her head. She was . . . very shaken. She said, 'I don't know. If I do, when he gets out of jail, he's going to kill me.' "

2. *Defense evidence.*

Milosavljevic testified that on September 16, 2013, he and Tomic argued after he asked for her help moving their cars in the driveway and she just walked into the house. When Milosavljevic followed her into the bedroom, Tomic shoved him, scratched him, spit at him, and tried to bite his arm. He did not touch her, nor did he see blood coming from her lip. While he was washing off the saliva, Tomic went back outside. Milosavljevic acknowledged that he stood in front of Tomic's car and may have raised his voice, but he denied yelling. He never threatened to kill her on that day. Milosavljevic testified he consumed two beers that day. Asked if this made him drunk, Milosavljevic replied: "I mean, doesn't make me really drunk. But, in some way, a little bit, yeah."

Milosavljevic testified he and his neighbor Tice had an affair seven or eight years before, but Milosavljevic broke it off when he realized it was a mistake. Tice "was very mad" and "she tried to make fight with me and my wife. But it didn't work."

7

Milosavljevic testified Tice's son Hansen was not to be believed because he owed Milosavljevic money and he had mental problems.

Regarding the 2012 incident, Milosavljevic testified he and Tomic were arguing about the cost of long-distance telephone calls to Serbia. She made him drop the phone and then began hitting him. The police came and took Milosavljevic to the hospital. He could not remember how the injury to his mouth occurred. He denied throwing the phone at Tomic.

Milosavljevic testified that Tomic, who worked as a baker, routinely got bruised while lifting heavy loads. Milosavljevic testified he did not accuse Tomic of cheating on him during the 2013 incident, and he did not tell Deputy Sanchez otherwise. Milosavljevic denied causing any of Tomic's injuries or saying any of the things he was accused of having said. The other witnesses were all lying.

3. *Prosecution rebuttal evidence.*

Deputy Sanchez testified that, on September 16, 2013, Milosavljevic admitted he argued with Tomic because she had been cheating on him.

4. *Trial outcome.*

The jury found Milosavljevic guilty of inflicting corporal injury to a spouse (Pen. Code § 273.5).[1] He was found not guilty of making criminal threats, but guilty of the lesser included offense of attempting to make a criminal threat (§§ 664 [attempt], 422 [criminal threats]). The deadly weapon enhancement allegation was found not true (§ 12022, subd. (b)(1)).

## CONTENTIONS

Milosavljevic contends: (1) the trial court erred by failing to instruct the jury on attempted infliction of corporal injury to a spouse as a lesser included offense; (2) the trial court erred by failing to instruct the jury that the offense of attempted criminal threats contains a reasonableness element; and (3) the trial court erred by failing to give the jury a unanimity instruction in connection with the criminal threat charge.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

**DISCUSSION**

1. *Trial court did not err by failing to instruct the jury on attempted infliction of corporal injury to a spouse*.

Milosavljevic contends his conviction for inflicting corporal injury to a spouse must be reversed because the trial court failed to instruct the jury on the lesser included offense of attempted infliction of corporal injury. There is no merit to this claim.

"When there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of a lesser included offense, the court must instruct upon the lesser included offense, and must allow the jury to return the lesser conviction, even if not requested to do so." (*People v. Webster* (1991) 54 Cal.3d 411, 443.) "An offense is necessarily included within a charged offense 'if under the statutory definition of the charged offense it cannot be committed without committing the lesser offense, or if the charging allegations of the accusatory pleading include language describing the offense in such a way that if committed as specified the lesser offense is necessarily committed.' [Citation.]" (*People v. Toro* (1989) 47 Cal.3d 966, 972, disapproved on other grounds by *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.)

Section 273.5 provides that "[a]ny person who willfully inflicts corporal injury resulting in a traumatic condition upon a victim described in subdivision (b) [a current or former spouse or intimate partner] is guilty of a felony." (§ 273.5, subd. (a).) Section 273.5 is a general intent crime. (*Donley v. Davi* (2009) 180 Cal.App.4th 447, 458; *People v. Campbell* (1999) 76 Cal.App.4th 305, 308; *People v. Thurston* (1999) 71 Cal.App.4th 1050, 1055.)

Section 21a provides: "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." Because attempting to inflict corporal injury to a spouse has this additional specific intent element, it is not a lesser included offense of the crime of inflicting corporal injury to a spouse. "[W]hile it might seem an attempt would naturally be a lesser included offense, this is not necessarily so. Attempts are only lesser included offenses if the sole distinction between the attempt and the completed offense is

9

completion of the act constituting the crime. [Citation.] If the attempt requires a heightened mental state, as is the case with attempts of many general intent crimes, the attempt requires proof of an additional element and is therefore not a lesser included offense. [Citations.]" (*People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1248 [holding that attempted rape of an intoxicated person is not a lesser included offense of rape of an intoxicated person].)

Milosavljevic cites *People v. Crary* (1968) 265 Cal.App.2d 534, 540, but that case merely held that attempted robbery is a lesser included offense of robbery, and robbery itself is a specific intent crime. (See, e.g., *People v. Myers* (2014) 227 Cal.App.4th 1219, 1225-1226 ["To prove Myers guilty of robbery, the prosecution was required to demonstrate Myers took personal property in the possession of another from his person or immediate presence, against his will, by means of force or fear, and with the specific intent permanently to deprive the person of such property. [Citations.]"].)[2]

Milosavljevic's jury was not misinstructed because attempted infliction of corporal injury to a spouse was not a lesser included offense of the charged crime of infliction of corporal injury to a spouse.

2. *Trial court did not prejudicially err by failing to instruct jury on reasonableness element of attempted criminal threat (§§ 664, 422).*

Milosavljevic contends that the trial court erred in failing to instruct the jury regarding a key element of attempted criminal threat—that to find him guilty of making an attempted criminal threat, the jury must conclude not only that Milosavljevic threatened to commit a crime resulting in death or great bodily injury, but also that Tomic *reasonably* feared for her safety. Milosavljevic contends the error was prejudicial because there was evidence from which the jury could have concluded that it would not have been reasonable for Tomic to be fearful. In this regard, he suggests there was

---

[2] Milosavljevic also cites *People v. Kinsey* (1995) 40 Cal.App.4th 1621, but that case merely held that the crime of attempted infliction of corporal injury to a spouse resulting in a traumatic condition does not require evidence of a resulting traumatic condition. (*Id.* at p. 1627.) There was no lesser included offense issue in *Kinsey*.

10

evidence that Milosavljevic and Tomic "often had fights in which they said they were going to kill each other," but "[like] Alice and Ralph on The Honeymooners," Milosavljevic did not intend to frighten Tomic, and Tomic was not actually frightened.[3]

The Attorney General agrees that the attempted criminal threat instruction was erroneous, but urges that the instructional error was harmless because the jury necessarily rejected Milosavljevic's theory of the case and the evidence was overwhelming that under the circumstances, Milosavljevic's threat to kill Tomic would have caused a reasonable person to fear for her safety.

As we discuss, although the trial court erred, the error was harmless.

a. *Legal principles.*

Section 422, subdivision (a), provides: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

In *People v. Toledo* (2001) 26 Cal.4th 221 (*Toledo*), our Supreme Court said: "In order to prove a violation of section 422, the prosecution must establish all of the

---

[3]     While showing the jury an image of Jackie Gleason and Audrey Meadows from the 1950's sitcom The Honeymooners, defense counsel argued: "[T]his might age [*sic*] me, but, in this show, there is a punch line. Okay? And the reason why this punch line was never a criminal threat is because Alice . . . was never scared of Ralph. Think about it. She was never scared." The "punch line" referenced by defense counsel was obviously one of Ralph's violent, but empty, threats that never scared or impressed Alice in the least.

11

following:  (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances.  [Citation.]"  (*Id*. at pp. 227-228.)

 *Toledo* pointed out there were certain situations in which a defendant would have committed no more than the lesser included offense of *attempting* to make a criminal threat.  "A variety of potential circumstances fall within the reach of the offense of attempted criminal threat.  For example, if a defendant takes all steps necessary to perpetrate the completed crime of criminal threat by means of a written threat, but the crime is not completed only because the written threat is intercepted before delivery to the threatened person, the defendant properly may be found guilty of attempted criminal threat.  Similarly, if a defendant, with the requisite intent, orally makes a sufficient threat directly to the threatened person, but for some reason the threatened person does not understand the threat, an attempted criminal threat also would occur.  Further, if a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat.  In each of these situations, only a fortuity, not intended by the defendant, has prevented the defendant from perpetrating the completed offense of criminal threat itself."  (*Toledo*, *supra*, 26 Cal.4th at p. 231.)

*Toledo* itself involved a domestic dispute in which the victim testified she was never in fear despite the defendant's threat to kill her. Rejecting the defendant's contention there was no such crime as attempted criminal threats, *Toledo* reasoned the jury could have found that, although defendant's death threat had been "made with the requisite intent and was the type of threat that satisfied the provisions of section 422 and reasonably could have caused [the victim] to be in sustained fear for her own safety," there was "a reasonable doubt . . . as to whether the threat *actually* caused [the victim] to be in such fear. Thus, the jury evidently found defendant guilty only of attempted criminal threat rather than the completed crime of criminal threat, not because defendant's conduct fell short of that required by the criminal threat provision, but simply because defendant's threat happened not to have as frightening an impact upon [the victim] as defendant in fact had intended." (*Toledo*, *supra*, 26 Cal.4th at p. 235.)

In *People v. Jackson* (2009) 178 Cal.App.4th 590 (*Jackson*), the court held that the crime of attempted criminal threat necessarily has a reasonableness element. In that case, the defendant who made a threat was unacquainted with the victims, who had served an eviction notice on their tenant and then visited the property to collect the key. The victims found the defendant, a friend of the tenant's, asleep in one of the bedrooms and told him to leave. Defendant responded by saying, " ' "I'm going to get an AK-47 and blow all your heads off." ' " (*Id*. at p. 594.) A jury convicted defendant of attempted criminal threats. On appeal, defendant argued "the trial court erred in failing to instruct the jury, sua sponte, that, in order to find him guilty of attempted criminal threat, it must find that 'it would have been reasonable for a person to have suffered sustained fear as a result of the threat under the circumstances of this case.' " (*Id*. at p. 595.) The *Jackson* court rejected the Attorney General's contrary argument that the crime of attempted criminal threat has no reasonableness element: "[A]s *Toledo* described it, a conviction for attempted criminal threat requires a finding that the defendant specifically intended to engage in the proscribed conduct—to make the type of threat prohibited by section 422– in order to bring about the proscribed consequence—fear that would be *reasonable* in the circumstances. Indeed, *Toledo*'s description of an attempted criminal threat encompasses

13

all the elements of the substantive crime except the subjective response of the victim. [Citation.]" (*Id.* at pp. 597-598, fn. omitted, italics added.)

*Jackson* went on to hold the trial court had prejudicially misinstructed the jury on the elements of attempted criminal threat and reversed the conviction: "In finding defendant not guilty of the completed crime but guilty of attempt, the jury must have found that defendant made the 'blow-your-head-off' statements and that he intended them to be taken as threats but that one or both of the last two elements of the completed crime was missing, namely that [the victims] did not suffer sustained fear or that their fear was unreasonable under the circumstances. The instruction allowed the jury to find defendant guilty of attempted criminal threats under either of these factual scenarios. And the evidence would support either scenario. The jury might not have believed [the victims] when they stated they actually feared for their lives. Or, the jury might have concluded, since [the victims] were safely inside the house with a telephone to call the police while defendant sat out front, or since defendant's threats were so outlandish, that defendant's statements could not reasonably have caused the victims to suffer sustained fear. The latter scenario is legally insufficient to support conviction of an attempted criminal threat and the former scenario is sufficient only upon finding that a reasonable person could have suffered fear in those circumstances, something the jury was not asked to decide. Since there is nothing in the record upon which to find that the verdict was actually based on a valid ground, we must reverse. [Citation.]" (*Jackson*, *supra*, 178 Cal.App.4th at p. 600.)

In *People v. Chandler* (2014) 60 Cal.4th 508 (*Chandler*), the Supreme Court adopted the reasoning of *Jackson* by holding: "[N]either the criminal threat statute (§ 422) nor the criminal attempt statutes (§§ 21a, 664[4]) unambiguously indicate that an attempted criminal threat requires only a subjective intent to threaten, with no objective component. To avoid substantial First Amendment concerns associated with

---

**4**      Section 664 provides, in pertinent part: "Every person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration, shall be punished where no provision is made by law for the punishment of those attempts, as follows . . . ."

14

criminalizing speech, we construe the offense of attempted criminal threat to require proof that the defendant had a subjective intent to threaten *and* that the intended threat under the circumstances was sufficient to cause a reasonable person to be in sustained fear. Accordingly, when a defendant is charged with attempted criminal threat, the jury must be instructed that the offense requires not only that the defendant have an intent to threaten *but also that the intended threat be sufficient under the circumstances to cause a reasonable person to be in sustained fear*." (*Chandler*, at p. 525, second italics added.)

b. *Discussion*.

The trial court instructed on the offense of making a criminal threat as follows:

"The defendant is charged in count 2 with having made a criminal threat. To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to Danica Tomic.

"2. The defendant made the threat orally.

"3. The defendant intended that his statement be understood as a threat. [¶]

"4. That the threat was so clear, immediate, unconditional and specific that it communicated to Danica Tomic a serious intention and the immediate prospect that the threat would be carried out.

"5. That the threat actually caused Danica Tomic to be in sustained fear for her own safety. And,

"6. Her fear was reasonable under the circumstances."

The trial court then instructed the jury that "[a]ttempted criminal threat is a lesser offense than criminal threat as charged in count 2," and "[t]o prove that the defendant is guilty of attempted criminal threat, the People must prove that: [¶] 1. The defendant took a direct but ineffective step towards committing criminal threat. And, [¶] 2. The defendant intended to commit criminal threat." The trial court gave a detailed explanation of what constituted "a direct step," and then told the jury: "To decide whether a defendant intended to commit criminal threat, please refer to the separate instruction that I have already given you on that crime."

15

Milosavljevic argues, and we agree, that the attempted criminal threat instruction was deficient because it failed to adequately inform the jury it had to consider whether the intended threat was sufficient under the circumstances to cause a reasonable person to be in sustained fear.[5]

The failure to instruct on an element of an offense is subject to *Chapman*[6] harmless error analysis: "[i]s it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" (See *Neder v. United States* (1999) 527 U.S. 1, 18 [119 S.Ct. 1827].)

Milosavljevic argues the instructional error was prejudicial because—although the jury must have found that he threatened to kill Tomic—"[t]here was evidence from which the jury could have concluded that fear would not have been reasonable under the circumstances." Milosavljevic points to evidence that he and Tomic often had fights in which they said they were going to kill each other, but he argues the defense theory was that "this is how this couple fights." Therefore, he argues, "the threats [were] not real and . . . it would not have been reasonable for Tomic to be in sustained fear." The crux of Milosavljevic's prejudice argument is that like Alice and Ralph on The Honeymooners, *he never really intended to frighten Tomic*, and *Tomic was never actually fearful of him*.

---

[5]    In *Jackson*, as in the case at bar, the trial court defined attempted criminal threat in part by referring the jury back to the definition already given regarding the completed offense: " 'To decide whether the defendant intended to commit threats of violence, please refer to the instructions I just gave you as to Counts one and two.' That is, the court simply referred the jury back to the elements of the substantive crime. *The problem with that was that the instruction on the substantive crime included the reasonableness element only as part of the result of the completed crime, i.e., that* [*the victims*] *suffered fear and that the fear they experienced was reasonable. Thus, in deciding whether defendant had the intent necessary to support conviction for attempted criminal threat, the jury was not instructed to consider whether the intended threat reasonably could have caused sustained fear under the circumstances*." (*Jackson*, *supra*, 178 Cal.App.4th at p. 599, italics added.)

[6]    *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824].

16

There are two flaws to Milosavljevic's argument. First, the jury did not accept his theory that he never really intended to hurt Tomic. The jury was instructed that the third and fourth elements of the crime of uttering a criminal threat were: "The defendant intended that his statement be understood as a threat" and "the threat was so clear, unconditional and specific that it communicated to Danica Tomic a serious intention and immediate prospect that the threat would be carried out." The jury, based on the correct portions of the attempted criminal threat instruction, determined Milosavljevic had uttered a true threat, i.e., a threat that he meant Tomic to believe he would carry out, which meant the jury necessarily rejected the theory that he never really intended to threaten her.

The second flaw in Milosavljevic's argument is that by arguing that Tomic was never actually afraid of him, Milosavljevic focuses on a subjective test, i.e., whether this victim actually sustained fear. However, the omitted portion of the jury instruction would have required the jury to apply an *objective* test—whether a *reasonable person under these circumstances would have sustained fear*. (*Chandler*, *supra*, 60 Cal.4th 508, 525 [the jury was required to find that the "intended threat under the circumstances was sufficient to cause a reasonable person to be in sustained fear"].)

As discussed below in connection with the unanimity instruction issue, there was overwhelming credible evidence that a reasonable person under these circumstances would have sustained fear as a result of Milosavljevic's threats. For example, Tice testified she had never seen appellant so angry and he frightened her. Both Hansen and Tice testified Milosavljevic was angry, pounded on the hood of Tomic's car, and repeatedly screamed he was going to kill Tomic. And there was abundant evidence that Milosavljevic regularly abused Tomic, including trying to strangle her on at least one occasion. As pointed out by the Supreme Court in *Chandler*, the evidence will not typically support a doubt as to reasonableness of the fear when a defendant "expressly threaten[s] to kill" the victim. (*Chandler*, *supra*, 60 Cal.4th at p. 525.) Hence, we conclude that—although the trial court erred by failing to instruct the jury on the reasonableness element of attempted criminal threats—the error was harmless beyond a

reasonable doubt because even if the reasonableness element had been included, the verdict would have been the same. (See *Neder v. United States*, *supra*, 527 U.S. at p. 18, [applying *Chapman* harmless error standard to instructional error omitting element of an offense].)

    3. *Trial court's failure to give unanimity instruction was harmless error.*

    Milosavljevic contends his conviction for attempting to make a criminal threat must be reversed because the trial court erred by not giving a unanimity instruction. Although we conclude the trial court erred, we also conclude the error was harmless.

    a. *Legal principles.*

    "In a criminal case, a jury verdict must be unanimous. . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.] [¶] This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)

    The prosecution's election may be accomplished by means of opening and closing argument. (See *People v. Mayer* (2003) 108 Cal.App.4th 403, 418 [prosecutor's opening and closing arguments constituted "an election for jury unanimity purposes"]; *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1455 ["Because the prosecutor's opening argument elected what conduct by defendant amounted to the crime charged, we conclude that no unanimity instruction was required."].)

    The principle of jury unanimity is predicated on "the 'constitutionally based concept that "the defendant is entitled to a verdict in which all 12 jurors concur, beyond a reasonable doubt, as to each count charged." [Citation.]' [Citation.] 'From this constitutional underpinning, four principles have emerged. First, if the prosecution shows several acts and each act is a separate offense, a unanimity instruction is required.' [Citation.] 'The second established principle is that a unanimity instruction is not

18

required when the case falls within the continuous course of conduct exception.' [Citation.] 'Analogous to the single course of conduct exception is the third established principle, that the failure to give CALJIC No. 17.01 is harmless when disagreement by the jury is not reasonably probable. [Citation.]' [Citation.] 'The fourth principle applicable to the question whether unanimity instructions are required is that the jury is not required to agree on the specific "theory" of guilt. [Citation.]' [Citation.] [¶] The continuous course of conduct exception arises in two contexts. [Citations.] 'The first is when the acts are so closely connected that they form part of one and the same transaction, and thus one offense. [Citation.] The second is when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time. [Citation.]' [Citation.]" (*People v. Jenkins* (1994) 29 Cal.App.4th 287, 298-299.) "The 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100.)

b. *Procedural background*.

The information charged Milosavljevic with two counts. Count 1 charged corporal injury to a spouse in violation of section 273.5. Count 2 charged making criminal threats in violation of section 422. Count 2 also stated: "It is further alleged that in the commission and attempted commission of the above offense, [Milosavljevic] personally used a deadly and dangerous weapon(s), to wit, HAMMER, said use not being an element of the above offense, within the meaning of Penal Code Section 12022(b)(1) . . . ."

The jury was not given a unanimity instruction. The only instruction related to the weapon use allegation was this: "The following crime and allegation requires a specific intent or mental state, criminal threat, as charged in count 2, and, personal use of a dangerous or deadly weapon. [¶] For you to find a person guilty of that crime or to find the allegation of personal use of a dangerous weapon true, that person must not only intentionally commit the prohibited act or intentionally fail to do a required act but must

19

do so with a specific intent.  [¶]  The act and the specific intent required are explained in the instruction for that crime and the allegation."

                c. *Discussion*.

Milosavljevic correctly points out the evidence demonstrated two distinct incidents, either of which might have been the basis for the attempted criminal threat conviction:  (1) his initial threat to kill Tomic, uttered outside their house before Tomic went back inside to retrieve her keys and cell phone; and, (2) his subsequent threat to kill Tomic uttered after she got into her car and Milosavljevic stood in front of it to prevent her from leaving.  Milosavljevic argues there was reversible error because the jury was never told it had to unanimously agree which of these two incidents would be the basis for its verdict.

The Attorney General argues it was unnecessary to give an explicit unanimity instruction because "the prosecutor did elect which statement formed the basis of count two by alleging in the information that in making the criminal threat, appellant personally used a deadly and dangerous weapon."  The Attorney General argues:  "[T]he jury was given the equivalent of an [*sic*] unanimity instruction through the combination of the count two allegation in the information and the corresponding instructions given regarding count two that repeatedly emphasized the first threat involving the use of the hammer.  The fact that the jury did not find the weapon allegation true likely stems from the various witnesses' confusion over what type of weapon it was.  Therefore, this case presents no unanimity problem because the prosecution elected the first threat through the specific charge alleged in the information, and the court gave the equivalent of a unanimity instruction by instructing the jury based on the circumstances of the threat charged in the information."

We are not persuaded by the Attorney General's argument.  The information merely said:  "It is further alleged that in the commission and attempted commission of the above offense, [Milosavljevic] personally used a deadly and dangerous weapon."  The prosecutor's closing argument, on the other hand, *expressly invited* the jury to rely on either incident to find Milosavljevic guilty of count 2.  The prosecutor told the jury:  "We

20

know that [Milosavljevic is guilty of count 2] because he stated he was going to kill Danica Tomic. We know because before she went into the house, David Hansen heard the defendant come out there with an object in his hand, raised over his head, saying, I'm going to kill you, you slut. [¶] And then you heard from David and . . . Julie Tice that when Danica was . . . in the car, the defendant was banging on the hood . . . saying, I'm going to kill you. . . . [¶] . . . [¶] *So if you find that the defendant met these elements before Danica went into the house, then he's guilty of criminal threat. If you find, okay, that first time, I don't think he was guilty of criminal threat, but he did it the second time, then he's guilty of criminal threat.*" (Italics added.) The prosecutor also told the jury: "[Y]ou . . . heard from David Hansen. . . . He told you how he saw, basically, two different types of criminal threat, the first one which started this whole event, and, the second one, when he's outside with his mom and he sees the defendant pounding on the car." Given these explicit invitations to find Milosavljevic guilty based on either one of the two incidents, we do not think the format of the information by itself was sufficient to put the jurors on notice that they all had to agree which incident constituted a violation, or attempted violation, of section 422.

However, we agree with the Attorney General that the error in failing to give a unanimity instruction was harmless. "There is a split of opinion in the appellate courts as to whether the *Chapman* standard or *Watson*[7] standard for harmless error applies in a unanimity instruction case. (See, e.g., *People v. Matute* (2002) 103 Cal.App.4th 1437, 1448 [noting conflicting authorities].) The majority of the courts that have addressed the issue have applied *Chapman*. (See, e.g., [*People v. Wolfe* (2003) 114 Cal.App.4th 177, 186-188]; *People v. Smith* (2005) 132 Cal.App.4th 1537, 1545; *People v. Deletto* (1983)

---

[7] *People v. Watson* (1956) 46 Cal.2d 818. *Watson* involves demonstrating that it is reasonably probable a result more favorable to appellant would have been reached in the absence of the error, while *Chapman* involves demonstrating that beyond a reasonable doubt the error did not contribute to the verdict. (*People v. Andrews* (2015) 234 Cal.App.4th 590, 606.)

21

147 Cal.App.3d 458; but see *People v. Vargas* (2001) 91 Cal.App.4th 506, 562 [*Watson* standard applies].)" (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 576.)

We conclude that, under either standard, the error was harmless. It is clear from the record that the jury rejected Milosavljevic's defense that he was not serious when he threatened to kill Tomic and she knew it. There was overwhelming credible evidence that Milosavljevic physically abused Tomic, that she was terrified of him, and that – even on those occasions when she reported him to the police in the immediate aftermath of such abuse – she later backed down and did not pursue her accusations. Milosavljevic testified that all the witnesses against him were lying, that he never touched Tomic, and that he did not threaten to kill her. Clearly the jury believed it was Milosavljevic who was lying. Milosavljevic provided essentially the same defense to both incidents, i.e., that Tomic was never scared of him because she knew his threats were not serious. "Where the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence, the failure to give the unanimity instruction is harmless. [Citation.]" (*People v. Thompson* (1995) 36 Cal.App.4th 843, 853.) Hence, there is no doubt that even had the trial court given a unanimity instruction, the verdict would have been the same.

The trial court's error in failing to give the jury a unanimity instruction constituted harmless error.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

KITCHING, J.

ALDRICH, J.